**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**HELEN REESE, o/b/o Gabriel Lopez,**

   **Plaintiff,**

**v.**              **CIV 04-340 LAM**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

   **Defendant.**

# MEMORANDUM OPINION AND ORDER

  **THIS MATTER** is before the Court on *Plaintiff's Motion to Reverse Administrative Decision Or, In The Alternative, A Remand Of Said Decision* (*Doc. 8*).  In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to having the undersigned United States Magistrate Judge conduct all proceedings and enter final judgment in this case.  The Court has reviewed Plaintiff's motion and the memorandum in support of the motion (*Doc. 9*), Defendant's response to the motion (*Doc. 10*), Plaintiff's reply to the response (*Doc. 11*), and relevant law.  Additionally, the Court has meticulously reviewed and considered the entire administrative record (hereinafter "*Record*" or "*R.*").  For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **DENIED**, and the decision of the Commissioner of Social Security (hereinafter "Commissioner") **AFFIRMED**.

## I.  Procedural History

  On July 20, 2001, Plaintiff's mother, Helen Reese, applied for Social Security Income benefits under Title XVI of the Social Security Act on behalf of her minor son, Gabriel Lopez. (*R. at 43-48.*)

In connection with this application, Plaintiff alleged a disability since April 12, 2001.  (*R. at 42,*

*43, 50.*)  In connection with his application, Plaintiff alleged a disability due to major motor seizures.

(*R. at 50, 89.*)  There is also some evidence in the *Record* that Plaintiff suffers from, or complains of,

recurrent migraine headaches.  (*R. at 82, 83, 89.*)  Plaintiff's application was denied at the initial and

reconsideration levels. (*R. at 26, 28 and 27, 34.*)

An administrative law judge (hereinafter "ALJ") conducted a hearing on April 30, 2003.

(*R. at 172-202.*)  Plaintiff was present and testified at the hearing. (*R. at 174-191.*)  Plaintiff was

represented by counsel at the hearing.  (*R. at 172.*)  On July 23, 2003, the ALJ issued his decision in

which he found that Plaintiff was not disabled at step three of the three-step sequential evaluation

process set forth in 20 C.F.R. § 416.924 as modified by Public Law 104-193, the Personal

Responsibility and Work Opportunity Reconciliation Act of 1996.  (*R. at18 .*)  The ALJ made the

following findings, *inter alia*, with regard to Plaintiff: (1) claimant has not engaged in substantial

gainful activity since the alleged onset of disability; (2) claimant has "severe" impairments pursuant

to the requirements in 20 C.F.R. § 416.924(c)[1]; (3) the testimony[2] at the hearing was credible to the

extent that the child is functioning in an age-appropriate manner in five of six domains; (4) the

limitations resulting from the effects of the claimant's impairments do not meet, medically equal, or

functionally equal the criteria of any of the listed impairments in Appendix 1, Subpart P, Regulations

No. 4 (20 C.F.R. § 416.924(d)); (5) the claimant does not have a combination of medically

determinable physical or mental impairments that result in marked and severe functional limitations;

---

[1]The ALJ found that Plaintiff had the severe impairments of juvenile myoclonic epilepsy and recurrent headaches. (*R. at 18.*)

[2]During the hearing, both Plaintiff and his mother testified.  *(R. at 172-202.)*

(6) the claimant has not been under a "disability" as defined in the Social Security Act, at any time

through the date of this decision (20 C.F.R. § 416.924(d)).

After the ALJ issued his decision, Plaintiff filed a request for review.  (*R. at 9.*)  On

January 24, 2004, the Appeals Council issued its decision denying his request and upholding the

decision of the ALJ.  (*R. at 5.*)  On March 25, 2004, Plaintiff filed his complaint in this action.

(*Doc. 1.*)

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether she applied the correct legal standards.

*See Hamilton v. Sec'y. of Health & Human Services*, 961 F.2d 1495, 1497-1498 (10th Cir. 1992).

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the

Commissioner's decision stands and Plaintiff is not entitled to relief.  *See, e.g., Langley v. Barnhart*,

373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004);

*Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  This Court's assessment is based on a

meticulous review of the entire record, where the Court can neither re-weigh the evidence nor

substitute its judgment for that of the agency.  *See Hamlin*, 365 F.3d at 1214; *see also Langley*, 373

F.3d at 1118.  "Substantial evidence" means "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118 (internal quotations and

citations omitted); *see also Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760.  An ALJ's decision

"is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there

is a mere scintilla of evidence supporting it."  *Langley*, 373 F.3d at 1118 (internal quotations and

citations omitted); *see also Hamlin*, 365 F.3d at 1214.

A child is disabled if he has a medically determinable impairment that results in "marked and severe functional limitations" and meets the twelve month duration requirement of the Act. 42 U.S.C. § 1382c(a)(3)(C)(i).   The Social Security Administration has adopted a three-step sequential analysis to determine whether a child is disabled.  20 C.F.R. § 416.924(a)-(d).  The first step is to determine whether the child is engaged in any substantial gainful activity.  20 C.F.R. § 416.924(b).  The second step is to determine whether the child has a medically severe impairment or combination of impairments.  20 C.F.R. § 416.924(c).  The third step is to determine whether the child's impairment(s) meet(s) or equal(s) any of the Listing of Impairments contained in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  20 C.F.R. § 416.924(d).  If the impairment meets or equals one of the Listings, then the child is considered disabled.  A negative answer at any of the three steps precludes a finding of disability.  20 C.F.R. 416.924a.  The claimant seeking benefits bears the burden of proving that his impairment meets or equals a listed impairment, and thereby, constitutes a disability.  *Hall ex rel. Lee v. Apfel*, 122 F. Supp. 2d 959, 964 (N.D.Ill. 2000) *quoting Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999); *Tate ex rel. Tate v. Commissioner of Social Security*, 2005 WL 1027930 at *2 (E.D. Mich.) quoting *Casey v. Sec'y of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993).

If, at step three, the impairment does not meet or equal one of the Listings, the Commissioner must determine if the limitations caused by the child's impairments are functionally equivalent to one of the Listings.  20 C.F.R. § 416.926a.  To be functionally equivalent, the child's limitations must be at least equal in severity and duration to limitations associated with a listed impairment.  20 C.F.R. § 416.926.  The "functionally equivalent" analysis requires the Commissioner to analyze six domains, which are "broad areas of functioning intended to capture all of what a child can or cannot do."  20

C.F.R. § 416.926a(b)(1).  The six domains are: (1) acquiring and using information; (2) attending and

completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects;

(5) caring for oneself; and (6) health and physical well-being.  *Id.*

### III.  Plaintiff's Age, Education, Work Experience and Medical History

At the time of the hearing, Plaintiff was fourteen years old and attending eighth grade.

*(R. at 174.)*   Plaintiff was not in special education classes or speech therapy at school.

*(R. at 56, 185.)*  Plaintiff has never worked.  *(R. at 58.)*

Plaintiff's mother testified that he had seizures at birth, but had no more seizures until he was

ten years old.  *(R. at 200.)*  Plaintiff's medical records begin with a visit to William J. Dean, M.D. of

BCA Medical Associates on April 13, 2001 when Plaintiff reported a grand mal seizure suffered at

midnight on April 12, 2001.  *(R. at 107.)*  The doctor's notes indicate a history of "seizures on dad's

side of family."  *Id.*  Dr. Dean scheduled Plaintiff for an EEG (electroencephalogram) and a CT of

his head.  *Id.*  The CT report indicated a "[l]arge cavum septum pellucidum[3], probably of little

significance.  Otherwise normal CT of the head."  *(R. at 103.)*  The April 24, 2001report on the

electroencephalogram indicated an "abnormal EEG" and that the "findings are strongly suggestive

of an ongoing epileptic tendency" and was "also suggestive of an abnormal focus in the left temporal

head region."  *(R. at 102.)*  Plaintiff returned to Dr. Dean on April 26, 2001 to get test results and

---

[3]The septum pellucidum is a thin plate of brain tissue, containing nerve cells and numerous nerve fibers, that is stretched like a flat, vertical sheet between the column and body of fornix below, and the corpus callosum above and anteriorly; it is usually fused in the median plane with its partner on the opposite side, but in less than 10% of humans there is a blind, slitlike, fluid-filled space between the two transparent septa that is called the cavity (cavum) of septum pellucidum. *Stedman's Medical Dictionary* 1621 (27th ed., Lippincott Williams & Wilkins 2000).

complained of a headache. *(R. at 106.)* Dr. Dean prescribed Motrin[4] for headache pain and Tegretol[5] 200mg for the seizures. *Id.*

On April 30, 2001, Plaintiff returned to Dr. Dean complaining of four headaches with nausea in the last week. *(R. at 105.)* Dr. Dean continued the Tegretol and prescribed Naprosyn[6] 250 and Tylenol with codeine. *Id.* On May 18, 2001, Plaintiff reported a five minute 'starring [sic] spell' followed by a headache. *Id.* Dr. Dean indicated the headaches were likely to be migraines and had Plaintiff continue the Tegretol at 200mg twice a day, Motrin every 6 hours, and Naprosyn and Tylenol as needed. *Id.*

On May 23, 2001, Dr. William G. Liakos of BCA Medical Associates noted Plaintiff's Tegretol level was 1.3 and increased the Tegretol dosage to 200mg in the morning and 400mg at bedtime. *(R. at 113.)* On June 8, 2001, Plaintiff returned to Dr. Liakos and reported three seizures since his last appointment, including a grand mal seizure lasting three to four minutes on the previous Monday, and that the headaches were getting worse. *Id.* On June 19, 2001, Plaintiff reported no seizures since his last appointment but increased headaches. *(R. at 112.)* Dr. Liakos scheduled a neurology consultation with Dr. Daniel Hurst in Lubbock. *Id.*

---

[4]Motrin (ibuprofen) belongs to a class of drugs called non-steroidal anti-inflammatory drugs (NSAIDS) used for the management of mild to moderate pain, fever, and inflammation. *MedicineNet.com.*

[5]Tegretol (carbamazepine) is an anti-seizure medication that works as an anti-convulsant for partial and grand mal seizures by reducing or blocking certain responses in the brain. *MedicineNet.com.*

[6]Naprosyn (naproxen) belongs to a class of drugs called non-steroidal anti-inflammatory drugs (NSAIDS) used for the management of mild to moderate pain, fever, and inflammation. *MedicineNet.com.*

On July 2, 2001, Daniel L. Hurst, M.D. of Texas Tech University Department of Neurology examined Plaintiff *(R. at 125-129)* and noted a history of epilepsy on both the maternal and paternal sides of Plaintiff's family. *(R. at 125.)* The daily dosages of Tegretol had just reached the theraputic level in Plaintiff's system, but Plaintiff's mother stated that Plaintiff had staring spells and "that maybe actually his seizure frequency has increased as the Tegretol has been increased." *Id.* Plaintiff reported "myoclonic jerks of both arms which may have a flurry prior to convulsion." *Id.* Dr. Hurst's impression was of Juvenile Myoclonic Epilepsy[7] and the treatment plan included tapering off the Tegretol and replacing it with Celontin[8] starting at 150mg once a day, to increase to 150mg twice a day over a two week period. *(R. at 126.)*

On July 20, 2001, Plaintiff returned to Dr. Liakos and reported no seizures and decreased headaches for the three weeks since he had seen Dr. Hurst and changed medications. *(R. at 111.)* Dr. Liakos provided guidelines regarding injury prevention because Plaintiff reported an earlier seizure while on a scooter. *Id.* Plaintiff reported to Dr. Hurst on August 14, 2001, that he had experienced only one seizure during the change in medication to Celontin and had suffered no side effects from the drugs. *(R. at 124.)* On September 10, 2001, Plaintiff told Dr. Liakos he had not had a seizure in a month and Dr. Liakos continued the medication regime with the Celontin dosage now at 300mg twice a day. *(R. at 110.)*

---

[7]Juvenile Myoclonic Epilepsy is an epileptic syndrome typically beginning in early adolescence, and characterized by early morning myoclonic jerks that may progress into a generalized tonic-clonic seizure. *Stedman's Medical Dictionary* 606 (27th ed., Lippincott Williams & Wilkins 2000).

[8]Celontin (methsuximide) is used to treat seizure disorders. Celontin may cause drowsiness or dizziness and must be taken on time to keep the level of medication in the blood constant. *MedicineNet.com.*

On October 11, 2001, Plaintiff reported to Dr. Hurst that he was doing well in school, eating well, and had not had a seizure for four months, but that the headaches had returned. *(R. at 123.)* Dr. Hurst increased the Celontin dosage to 300mg in the morning and 450mg at bedtime, for a daily total of 750mg. *Id.* On December 13, 2001, Plaintiff told Dr. Hurst that his seizures and headaches were better, and reported no side effects from the medication, but complained of myoclonic jerks in his arms. *(R. at 121-122.)* Dr. Hurst again increased the Celontin dosage to 300mg in the morning and 600mg at night. *Id.* On March 19, 2002, Plaintiff again reported to Dr. Hurst that he was doing well, had had no seizure activity and only occasional headaches. *(R. at 166.)*

On June 20, 2002, Plaintiff returned to Dr. Hurst complaining of "arms jerking and really bad headaches." *(R. at 165.)* Dr. Hurst prescribed Depakote[9] 250mg, to be increased to three times daily and instructed Plaintiff to taper off Celontin. *Id.* On July 22, 2002, Plaintiff had no complaints although he continued to have arm jerking approximately two to three times a week and staring spells approximately once a month. *(R. at 163-164.)* Plaintiff reported a decreased frequency of seizures and staring spells after he discontinued the Celontin and began Depakote. *Id.*

On August 20, 2002, Plaintiff's mother reported Plaintiff had the "worst seizure ever" while asleep and had been taken to the emergency room. *(R. at 162.)* By telephone, Dr. Hurst instructed Plaintiff to increase the Depakote, to return to the emergency room if Plaintiff had another major seizure and come for an examination. *Id.* On August 29, 2002, Plaintiff told Dr. Hurst he had missed school due to two seizures, had a bad headache, and was lethargic and sleepy. *(R. at 161.)* Dr. Hurst

---

[9]Depakote (valproic acid, VPA) is used for the treatment of convulsions, migraines and bipolar disorder. *MedicineNet.com.*

instructed Plaintiff to restart Celontin at 150mg three times daily and decrease the VPA (valproic acid or Depakote) to 250mg three times daily.  *Id.*

Plaintiff's mother reported he had two seizures that were only "arm jerks" since the last visit when Plaintiff returned to Dr. Hurst on September 26, 2002.  *(R. at 158.)*  Plaintiff's main complaint was migraine headaches but the headaches had improved with Motrin and since re-starting Celontin.  *Id.*  Dr. Hurst continued Plaintiff's Celontin, Depakote and Motrin and discussed the possibility of starting Topamax.  *(R. at 158-159.)*   On October 10, 2002, Dr. Hurst increased the Celontin dosage after reviewing lab results from September 26, 2002.  *(R. at 157.)*  On October 22, 2002, Plaintiff reported continued arm jerking but no headaches since his last visit.  *(R. at 156.)*  And on December 20, 2002, Plaintiff reported to Dr. Hurst that he was doing well, had no problems and no seizures.  *(R. at 155.)*

## IV.  Discussion/Analysis

Plaintiff contends that the ALJ erred at step three of the sequential analysis for childhood disability benefits.  Specifically, Plaintiff asserts that: (1) the ALJ erred by disregarding and mis-interpreting medical reports from Plaintiff's treating physician; and (2) the ALJ erred in evaluating Plaintiff's and Plaintiff's mother's testimony.  Additionally, in the Reply Brief, Plaintiff alleges that: (1) the ALJ erred in evaluating Plaintiff's Epilepsy Listing; (2) that the medical evidence is not legible and (3) that Plaintiff's school accomplishments were wrongly evaluated.  *(Plaintiff's Reply Brief, Doc. 11.)*  Plaintiff asks the Court to reverse the Commissioner's decision or, alternatively, remand for a new decision based on updated medical opinions.  Defendant argues that the ALJ applied the correct legal standards and correctly determined that Plaintiff is not disabled based on substantial evidence.

### A.  Medical Reports From Plaintiff's Treating Physicians

Plaintiff argues that the ALJ erred in disregarding Plaintiff's treating physicians reports, but fails to develop any coherent argument or offer evidence supporting his claim.  *(Plaintiff's Memorandum, Doc. 9 at 2-3.)*  In response, Defendant cites to *Murrell v. Shalala*, 43 F.3d 1388, 1390, n. 2 (10th Cir. 1994), wherein the court noted that "perfunctory complaints fail to frame and develop an issue sufficient to invoke appellate review."

Plaintiff includes an incomplete and edited list of Plaintiff's medical records and simply states this list "reveals a continuing, chronology of severe and chronic neurological impairments." *(Plaintiff's Memorandum, Doc. 9 at 2.)*  Plaintiff's medical records, included in the administrative record, begin April 13, 2001 and go through December 20, 2002, but Plaintiff only refers to an incomplete list of medical visits during 2001.  *Id. at 2-3.*  Because Plaintiff failed to provide a coherent argument supported by evidence, the Court characterizes Plaintiff's argument as a failure by the ALJ to properly consider the clinical notes of treating physicians Dr. Dean and Dr. Liakos  or to provide specific, legitimate reasons for a rejection of their opinions.

Dr. Dean and Dr. Liakos were Plaintiff's treating physicians at BCA Medical Associates immediately following the onset of Plaintiff's seizures on April 12, 2001. *(R. at 105, 106, 107, 109, 110, 111, 112, 113.)*  However, Plaintiff was referred to Dr. Hurst on July 2, 2001 and Dr. Hurst became the treating physician regarding Plaintiff's seizure and headache conditions thereafter. *(R. at 121-129, 155-166.)*  Dr. Hurst was the doctor who monitored and adjusted Plaintiff's medications and symptoms from July, 2001 through December, 2002.  *Id.*  The ALJ accepted that Plaintiff was diagnosed with juvenile myoclonic epilepsy and that this diagnosis was confirmed by an abnormal EEG on April 24, 2001 that was ordered by Dr. Dean.  *(R. at 15.)*  The ALJ noted

Plaintiff's set-backs and adjustments as the proper medications and proper dosages were determined *(R. at 15-16)*, and that Plaintiff often reported he was doing very well as the drug regimen began to minimize the seizures and headaches. *(R. at 15-16.)*

While the record must demonstrate that the ALJ considered all of the evidence and discussed the evidence supporting his decision, as well as any significantly probative evidence he rejected, the ALJ need not discuss every piece of evidence. *Clifton v. Chater,* 79 F.3d 1007, 1009-1010 (10th Cir. 1996). In short, the ALJ need only provide a discussion sufficient to allow for a meaningful review by the court. *Id.* The Court does not agree that the ALJ ignored or rejected the opinions of Dr. Dean and Dr. Liakos, but finds that they were treating physicians only during the earliest phase of Plaintiff's diagnosis and treatment and that their clinical notes do not contradict the later observations of Dr. Hurst.[10] The ALJ logically focused his decision on the continued treatment and control of Plaintiff's symptoms by Dr. Hurst, a specialist in neurology. Because Dr. Dean's and Dr. Liakos' clinical notes are not inconsistent with the later opinions of Dr. Hurst, the Court finds no error in the ALJ's failure to specifically mention Dr. Dean's and Dr. Liakos' clinical notes in his decision, and concludes that substantial evidence in the record as a whole supports the ALJ's decision.

## B. Plaintiff's and Plaintiff's Mother's Testimony

Plaintiff alleges that the ALJ erred in assessing the credibility of both Plaintiff's and Plaintiff's mother's testimony. *(Plaintiff's Memorandum, Doc. 9 at 3-4.)* Plaintiff argues that the testimony of a fourteen-year old adolescent is unreliable due to "visions of grandiose, unlimited normal everyday

---

[10]In Plaintiff's Reply brief, he alleges that the medical reports are not legible and the ALJ erred in basing his decision on medical reports that are not legible. *(Doc. 11 at 4-5.)* The Court finds the medical records are sufficiently legible to allow comprehension and a reasoned decision, and that Plaintiff's allegation is without merit.

functioning," and an inability to have personal knowledge about what goes on during a seizure. *Id.*
*at 3.* Plaintiff also argues that the testimony of his mother should be given more weight as she was
able to testify more fully as to the "nature and frequency of the seizures." *Id.* Defendant argues that
the testimony of Plaintiff and his mother is not significantly different except that the mother's
testimony focused more on the precautionary measures Plaintiff must take to prevent potential
injuries. *(Defendant's Response, Doc. 10 at 6-7.)*

If a child under age eighteen is unable to adequately describe his symptoms, an ALJ is
required to accept statements describing the symptoms from a person who is most familiar with the
child, such as a parent, other relative or guardian. 20 C.F.R. § 416.928(a). These statements must
be supported by signs and laboratory findings determined by medically acceptable diagnostic
techniques. *Id.* At age fourteen, Plaintiff testified at the hearing and was able to explain the types
of seizures[11] he experienced *(R. at 186-188)*; his participation in basketball, soccer, track, and bicycle
and skateboard riding *(R. at 180-183)*; attendance in regular school classes *(R. at 185)*; and the effects
of the migraine headaches and his medications *(R. at 186, 188-189.)* Plaintiff's mother testified
concerning Plaintiff's seizures and the aftermath of the seizures (tired, sleepy) *(R. at 196, 198)*; his
medications and their side effects (hair loss and weight gain) *(R. at 193-194)*; his school attendance
(missed school for doctor appointments and migraines) *(R. at 194)*; the need for precautionary
measures (wearing a helmet during activities and sitting in the front row in class) *(R. at 195, 197)*;
and his independence and pride ("doesn't like other people [to] know he's got the problem."). *(R. at*
*197).*

_____

[11]Plaintiff reported three types of seizures including grand mal, "blank stare," and jerking of
the extremities. *(R. at 178-179, 186-187.)*

"Credibility determinations are peculiarly the province of the finder of fact," and will not be overturned if supported by substantial evidence. *Diaz v. Sec'y of Health and Human Services*, 898 F.2d 774, 777 (10th Cir. 1990). However, such deference is not absolute. *Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir. 1993). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted).

In this case, Plaintiff testified in an age-appropriate and informed manner with a clear understanding of his condition and the adjustments necessary to his life. Plaintiff was able to adequately describe his symptoms to the ALJ and these descriptions were consistent with Plaintiff's complaints as documented in the medical records. The nature and frequency of the seizures were included in the medical records as well as the mother's testimony. After a careful analysis of all the evidence, the ALJ found the "testimony at the hearing is credible to the extent that the child is functioning in an age-appropriate manner in five of six domains." *(R. at 18.)* The ALJ clearly considered both Plaintiff's and his mother's testimony in reaching his decision and the ALJ's decision did not evidence rejection or discrediting of either person's testimony.[12] *(R. at 17, 18.)*

The Court agrees with Defendant that there are only minor differences in the testimonies of Plaintiff and his mother, which are supported by the objective medical evidence, and, therefore, finds no basis to weigh the mother's testimony more heavily. After examining the record as a whole, the Court is persuaded that the ALJ's credibility findings are closely and affirmatively linked to substantial

---

[12]*See Hilson ex rel Phelps v Barnhart*, 64 Fed. Appx. 134, 2003 WL 1904787 at *1 (10th Cir. 2003) (unpublished) ( There was no error in ALJ's failure to expressly address credibility where the ALJ clearly considered the claimant's mother's testimony and the conclusion did not evidence rejection or discrediting of the mother's hearing testimony).

evidence in the record and the Court will not reweigh the evidence or substitute its judgment for that

of the Commissioner.

<strong><u>C.  Epilepsy Listing Evaluation</u></strong>

In his reply brief, Plaintiff alleges that the ALJ erred in evaluating Plaintiff's seizures in regard

to meeting the listing requirements for epilepsy, Listing 11.03.[13] *(Plaintiff's Reply Brief, Doc. 11 at*

*2, 4.)* As the Court noted above, at step three of the sequential evaluation procedure, the ALJ must

determine whether the child's impairment  meets or equals any of the Listing of Impairments

contained in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  20 C.F.R. § 416.924(d).  If, at step three,

the impairment does not meet or equal one of the Listings, the Commissioner must determine if the

limitations caused by the child's impairments are functionally equivalent to one of the Listings.

20 C.F.R. § 416.926a.

A child's impairment is functionally equal to a listed impairment if there is an "extreme"

limitation in one of the six specific domains, or a "marked" limitation in at least two domains.

20 C.F.R. § 416.926a.  Domain analysis considers the child's age-appropriate functioning in relation

to acquiring and using information, attending and completing tasks, interacting and relating with

others, moving around and manipulating objects, caring for oneself, and health and physical well-

---

[13]In his reply brief, Plaintiff erroneously refers to Listing 11.03 Epilepsy (nonconvulsive), under Part A of Appendix 1 to Subpart P of Part 404, which is the criteria applicable to individuals age 18 and over and to children under age 18 where the criteria are appropriate.  Because Plaintiff is under age 18, his major motor disorder (convulsive epilepsy), should be evaluated under Listing 111.02(A) of  Part B of Appendix 1 to Subpart P of Part 404, which lists the criteria for the evaluation of children under age 18 (where criteria in Part A do not give appropriate consideration to the particular disease process in childhood).  In the case of Plaintiff's epilepsy, the use of Part B criteria listing is appropriate because young children may have convulsions in association with febrile illnesses that must be differentiated from convulsive epilepsy.  20 C.F.R. Part 404, Subpart P, Appendix 1, Parts A(11.0)(A) and B(111.00)(A).  *See also* 20 C.F.R. § 416.925(b)(2).

14

being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairments result in "marked" limitations in

two domains, or an "extreme" limitation in one domain, the impairment functionally equals the listing.

20 C.F.R. § 416.926a(d).  A "marked" limitation is one that "interferes seriously with [a child's]

ability to independently initiate, sustain or complete activities."  20 C.F.R. § 416.926a(e)(2).  An

"extreme" limitation is one that "interferes very seriously with [a child's] ability to independently

initiate, sustain or complete activities."  20 C.F.R. § 416.926a(e)(3).

 In this case, the ALJ noted that the record indicated Plaintiff suffered from juvenile myoclonic

epilepsy, confirmed by an abnormal EEG, and recurrent headaches defined as severe within the

meaning of the regulations.  *(R. at 15.)*  The ALJ stated that the listing applicable to this condition

was 111.02, major motor seizure, with criteria requiring the occurrence of more than one major

motor seizure per month despite at least three months of prescribed therapy.  (*Id.*; 20 C.F.R. Part

404, Subpart P, Appendix 1, Part B(111.02)(A))   After reviewing Plaintiff's medical records, the

ALJ concluded that Plaintiff's impairment did not satisfy the severity requirements of Listing 111.02

because Plaintiff "does not have the occurrence of more than one major motor seizure per month

despite at least three months of prescribed treatment," and because "while the [Plaintiff] continues

to have complaints of 'arm jerking,' the child is doing well with no problems, including headaches."

*(R. at 15-16.)*

 Medical equivalency is determined by comparing the symptoms, signs, and laboratory findings

of a claimant's impairment with the corresponding medical criteria shown for that listed impairment.

20 C.F.R. § 416.926.  The ALJ found there was "no medical opinion deciding medical equivalence

by a medical consultant designated by the Commissioner," the objective medical evidence did not

support a finding of medical equivalence, and that this finding was consistent with the evaluations of

agency physicians who reviewed the medical evidence and determined Plaintiff's impairments did not meet or medically equal any section of the listings. *(R. at 16.)*

After listing the proper standards and defining the necessary terms, the ALJ conducted a functional equivalency analysis. *(R. at 16.)* The ALJ considered the reports of agency medical consultants, treating, examining and non-examining medical sources. as well as the Plaintiff's and Plaintiff's mother's testimony and Plaintiff's symptoms and activities. *(R. at 17.)* The ALJ assessed how Plaintiff functioned in each of the six domains and found no marked limitations in domains one through five. *Id.* This assessment was consistent with the findings of the agency physician. *(R. at 130-136.)* The sixth domain is health and physical well-being and requires consideration of the cumulative effects of impairments along with the associated treatments or therapies, the stability of the condition, and functioning during periods of exacerbation. 20 C.F.R. § 416.926a(e)(2)(iv) and (3)(iv), 20 C.F.R. § 416.926a(l). The ALJ found Plaintiff "would have frequent episodes or exacerbations of his illness without the prescribed medications. He has no other physical or mental illnesses that seriously affect his health or physical well being." *(R. at 18.)* In summary, the ALJ stated that Plaintiff "**does not have marked limitations in two of six domains of functioning**" and, therefore, the Plaintiff "does not have functional limitations that are equivalent to a listing." *Id.* (emphasis in original.)

The Court finds Plaintiff's allegation to be without merit and finds that the ALJ stated the correct standards and properly analyzed Plaintiff's seizures in regard to meeting the listing requirements and his functional limitations.

16

### D.  Evaluation of Plaintiff's School Accomplishments

In his reply brief, Plaintiff argues that the ALJ improperly evaluated Plaintiff's continued school accomplishments. *(Plaintiff's Reply Brief, Doc. 11 at 5.)*  The Plaintiff alleges that the "ALJ fails to give any importance to the fact that the claimant is progressing in school despite his seizures and should be commended for his progress." *Id.*  The Court disagrees.  The ALJ's duty is to evaluate Plaintiff's ability to function in his daily activities, including school, in spite of his functional limitations.  20 C.F.R. § 416.926a.  Plaintiff's ability to function and continue to achieve in school, at an age appropriate level, is an element in the analysis determining if Plaintiff is disabled.  20 C.F.R. § 416.924a(2)(iii).  The Court finds that the ALJ properly assessed Plaintiff's ability to function in school and finds Plaintiff's argument to be without merit.

## V.  Conclusion

In conclusion, the Court **FINDS** that the Commissioner's decision is supported by substantial evidence in the record as a whole and comports with relevant legal standards.  Accordingly, the Court **AFFIRMS** the decision of the Commissioner.

**WHEREFORE, IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and *Plaintiff's Motion to Reverse Administrative Decision Or, In The Alternative, A Remand Of Said Decision* (*Doc.8*) is **DENIED**.  A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**

17